# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 17, 2013 Session

## IN RE JAMES C. E.[1]

### Appeal from the Juvenile Court for Hawkins County
### No. HJ120219    Hon. Daniel G. Boyd, Judge

---

### No. E2012-02217-COA-R3-PT-FILED-MAY 6, 2013

---

This is a termination of parental rights case in which the Tennessee Department of Children's Services sought to terminate the parental rights of Robert E. and Susan E.[2] to James C. E. The trial court terminated Robert E.'s parental rights, finding that he had abandoned James C. E. and that termination of his parental rights was in the best interest of James C. E. Robert E. appeals. We affirm the decision of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and D. MICHAEL SWINEY, J., joined.

William E. Phillips, II, Rogersville, Tennessee, for the appellant, Robert E.

Robert E. Cooper, Jr., Attorney General and Reporter, and Derek C. Jumper, Assistant Attorney General, General Civil Division, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Dana L. Scott, Kingsport, Tennessee, guardian ad litem for the minor, James C. E.

---

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last names of the parties.

[2]Susan E. voluntarily surrendered her parental rights and is not a party to this appeal.

**OPINION**

## I. BACKGROUND

This appeal relates to the termination of Robert E's parental rights. Therefore, the factual background will mostly contain information pertaining to Robert E. ("Father"). On January 20, 2010, Father was arrested and charged with theft and burglary, Class D felonies. He was subsequently indicted on the charged felony offenses. James C. E. ("the Child") was born to Father and Susan E. ("Mother") on July 2, 2010. Nine months later, the Child was removed from the care of Father and Mother (collectively "the Parents") based upon allegations that the Child had been exposed to drugs. The Child was placed in the protective custody of the Tennessee Department of Children's Services ("DCS"). The Parents were not present at the custody hearing because DCS could not locate them.

On April 18, 2011, while on bond for the indicted felony offenses and after the Child had been placed with DCS, Father was arrested for the initiation of a process intended to result in the manufacture of methamphetamine, a Class B felony. Shortly thereafter, the Child was adjudicated as dependent and neglected. Father eventually pled guilty to all three felony offenses and was sentenced as a Range I, standard offender. He received concurrent sentences of two years and one day for the Class D felonies[3] and a consecutive sentence of eight years for the Class B felony.

On February 28, 2012, DCS filed a petition to terminate Father's parental rights. The grounds asserted for termination were abandonment for failure to pay child support, failure to visit, failure to provide a suitable home, and engaging in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the Child; substantial noncompliance with the permanency plan; and failure to remedy the conditions which led to the removal of the Child. Toward the end of the trial on the termination petition, DCS removed all but one ground supporting its termination petition, namely Father's alleged abandonment of the Child as displayed by his engaging in conduct that exhibited a wanton disregard for the welfare of the Child.

Two DCS employees testified in support of the termination petition. However, the majority of their testimony related to the termination grounds that had been dismissed. As such, we will only recount the testimony that relates to the remaining termination ground. Candace Seals, a case manager for DCS, testified that she served as the Child's case manager from April 2011 until October 2011. She related that neither parent was present at the home when the Child was initially removed. She stated that Father was incarcerated approximately

---

[3]He was ordered to serve 110 days before he was eligible for release for the Class D felonies.

one month[4] after the Child's removal. She said that he remained incarcerated and that she was unsure as to when he would be released. She claimed that Father never contacted her about the Child and that she was unable to locate him prior to his incarceration. She recalled that once Father was incarcerated, she finally spoke with him. She recalled that he told her that he was hiding in the closet when the Child was removed from the house.

Pam Mayo, a team leader for DCS, testified that she supervised some of the Child's case managers. She related that once incarcerated, Father completed a parenting assessment pursuant to the obligations contained in his permanency plan. She opined that the parenting assessment revealed that Father would need additional services before he would be able to reunite with the Child following his release. She claimed that due to Father's incarceration, the Child did not have a relationship with Father and had not seen or spoken to Father since the time of removal.

Ms. Mayo stated that the Child had been placed in a special needs home because he had been diagnosed with early-onset asthma. She related that the Child remained in the same home since the time of removal and was "very attached" to the foster parents. She admitted that the foster parents had no intention of adopting the Child, who was still very young. She related that the foster parents believed that the Child needed a younger family. She claimed that if Father's rights were terminated, the foster parents were committed in helping the Child transition into an adoptive home. She believed that DCS would be able to select a suitable home "pretty quickly" because of the Child's young age. She related that if the Child were returned to Father, the Child would also undergo a transition process. She believed it would take a considerable amount of time to begin that transition given Father's incarceration. She opined that the Child was "at a real crucial period in his development" and that "the sooner [DCS could] get him integrated into a permanent home, the better off he'll be."

Father stated that prior to the Child's removal, he lived with Mother and the Child. He claimed that he did not hide in the closet while the Child was removed. He stated that he handed the Child to Mother before fleeing the house. He explained that he left because he simply did not "like the law." He related that he had just been released from jail approximately three weeks prior to the Child's removal and that he was "on bond" at the time. He recalled that he returned to the residence when Mother informed him that the officers were not looking for him but were there to remove the Child.

Father acknowledged that he pled guilty to two Class D felonies and one Class B felony. He related that he had already served his sentence for the Class D felonies and that

---

[4] She initially testified that he was incarcerated four months after the Child's removal but later changed her testimony when confronted with the arrest warrant.

he was now serving his eight-year sentence for the Class B felony. He did not know when he might be released. He opined that he loved the Child and hoped to establish a fatherly relationship with the Child. He claimed that he was committed to doing what was required to establish that relationship.

Following the presentation of the above evidence, the trial court found that there was clear and convincing evidence to establish that Father had abandoned the Child by engaging in conduct that displayed a wanton disregard for the welfare of the Child pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(iv). In so finding, the court stated,

> [Father's] repeated behavior of burglary and theft and the initiation of the process intending to result in manufacture of methamphetamine does show a wanton disregard for the welfare of the [C]hild. [Father] was released on bond for one charge, and while he was released on bond he engaged in behaviors which resulted in further charges resulting in his continued incarceration for the past eighteen (18) months.

The court further found that termination of Father's parental rights was in the best interest of the Child when Father had not made an adjustment of circumstances as to make it safe and in the Child's best interest to return home, had failed to maintain regular visitation and a meaningful relationship with the Child, and was unable to care for the Child in a safe and stable manner due to his criminal activity. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal as follows:

A. Whether there was clear and convincing evidence to establish that Father abandoned the Child.

B. Whether termination of Father's parental rights was in the best interest of the Child.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149

S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV. DISCUSSION

### A.

Father argues that the trial court relied upon inadmissible hearsay testimony in terminating Father's parental rights. He likewise asserts that the court also considered conduct that occurred prior to the Child's birth in concluding that he had wantonly disregarded the Child's welfare. He claims that there was "simply no evidence that [he] actually exhibited a wanton disregard for the welfare of [the Child]." DCS responds that the "evidence presented at trial clearly and convincingly demonstrated that [Father's] conduct prior to incarceration exhibited a wanton disregard for [the Child's] welfare." DCS notes that Father was "free on bond" when he committed an additional crime that resulted in his

continued incarceration and that he was not present when the Child was removed and could not be found after the removal.

Relative to the alleged abandonment of the Child, the Tennessee Code provides, in pertinent part,

(1)(A) For purposes of terminating the parental [] rights of [a parent] to that child in order to make that child available for adoption, "abandonment" means that:

\* \* \*

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv). Under this ground of abandonment, the parent's incarceration "serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. The court may consider any relevant conduct that occurred prior to incarceration and is not limited to reviewing the four months immediately preceding the incarceration. *Id.* at 870-71. This court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68 (citations omitted).

As a threshold issue, we reject Father's allegation that the evidence relied upon in terminating his parental rights was inadmissible. Contrary to Father's assertion, the information that was relied upon in finding that he had abandoned the Child was uncontroverted. Whether he was hiding in a closet or fled from the premises, Father admitted that he was not present when the Child was removed from the home. He also did not appear at the custody hearing or contact DCS to inquire about the Child. Instead, he committed a Class B felony while the Child languished in DCS custody. He admitted that he committed the felony while on bond for other felony charges that he committed prior to the Child's birth. We agree that the criminal activity that occurred prior to the Child's birth should not

be considered in support of the allegation that he abandoned the Child. Nevertheless, this court may consider the fact that Father committed an additional crime while he was awaiting a resolution on other felony charges, while the Child languished in DCS custody, and while he failed to attend a custody hearing concerning the Child or even inquire as to the Child's status with DCS. Each fact, when considered alone, would not support an allegation of abandonment. When considered as a whole, Father's actions provide clear and convincing evidence to establish that he engaged in conduct prior to incarceration that exhibited a wanton disregard for the Child's welfare. Accordingly, we conclude that the record supports the trial court's finding that Father abandoned the Child.

B.

Having concluded that there was clear and convincing evidence supporting the statutory ground to terminate Father's parental rights, we must consider whether termination of Father's parental rights was in the best interest of the Child. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

(I) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(I). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In this case, a number of the best interest factors weigh against Father as a result of his incarceration. As evidenced by his incarceration, Father had not made the adjustment of circumstances necessary to provide a stable home for the Child. Tenn. Code Ann. § 36-1-113(i)(1). Father had not visited the Child since the time of removal. Tenn. Code Ann. § 36-1-113(i)(3). Given the Child's young age, the Child had not maintained a meaningful relationship with Father as a result of a lack of visitation. Tenn. Code Ann. § 36-1-113(i)(4). Given Father's criminal history of felony convictions, questions remain as to whether the physical environment of Father's potential home would be safe following his incarceration. Tenn. Code Ann. § 36-1-113(i)(7). Father never submitted child support. Tenn. Code Ann. § 36-1-113(i)(9).

We acknowledge that regardless of whether Father's rights are terminated, the Child must undergo a lengthy transition process because his foster parents are not willing to adopt

such a young child. However, we believe the above considerations overcome the fact that the Child is in a transitional state and has not attained permanency with potential adoptive parents. Knowing that the Child was in DCS custody, Father committed an additional crime while on bond for other felony charges. He chose to resume his criminal behavior instead of working with DCS and putting himself in a position in which he could adequately care for the Child. As a result of Father's actions, he prolonged his incarceration and prevented the Child from attaining any amount of stability with him or others for several years. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Father's parental rights was in the best interest of the Child. Accordingly, we affirm the decision of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Robert E.

_____
JOHN W. McCLARTY, JUDGE